# In the United States District Court
# For the Northern District of Illinois
# Eastern Division

JOHN GNUTEK AND THOMAS          )
HOBGOOD,                         )
                                 )
    PLAINTIFFS,           )
                                 )
    v.                    )      Case No.    08 C 5516
                                 )      Judge Pallmeyer
ILLINOIS GAMING BOARD, ILLINOIS  )      Magistrate Judge Schenkier
DEPARTMENT OF REVENUE, MARK      )
OSTROWSKI, BRIAN HAMER, LAINIE   )
KROZEL, DEBORAH TUMULTY, LUKE    )
HARTIGAN and CARLOS AULET,       )
                                 )
    Defendants.           )

## PLAINTIFFS' MEMORANDUM OF LAW
## In Opposition to Summary Judgment

John A. Baker, *lead counsel*
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:   (217) 522-3445
Facsimile:    (217) 522-8234
E-mail: johnbakerlaw@sbcglobal.net

Now Come the Plaintiffs, JOHN GNUTEK [hereafter "Gnutek"] and THOMAS

HOBGOOD [hereafter "Hobgood"] and in response to the motion for summary judgment

[Docs. 116-118], filed by the defendants, Illinois Department of Revenue [hereafter the

"Department"], the Illinois Gaming Board [hereafter the "IGB"], Mark Ostrowski

[hereafter "Ostrowski"], Brian Hamer [hereafter "Hamer"], Lainie Krozel [hereafter

"Krozel"], Luke Hartigan [hereafter "Hartigan"] and Carlos Aulet [hereafter

"Aulet"][collectively referred to as "Defendants"] state as follows:

## I. INTRODUCTION

Gnutek and Hobgood have filed a four count complaint against the Defendants

[Doc. 1]. Count I is a claim, brought by Hobgood, against the Department and the IGB

alleging that he was retaliated against in violation of the participation prong of Title VII

of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-3(a).

Count II is a First Amendment retaliation claim brought by Hobgood against

Ostrowski, Hamer, Krozel and Hartigan, pursuant to 42 U.S.C. §1983. Count III is

likewise a First Amendment retaliation claim, however, it is brought by Gnutek against

Ostrowski, Hamer, Krozel and Aulet. Count IV is a Title VII retaliation claim filed by

Gnutek.

The Defendants have moved for summary judgment as to all Counts. For the

reasons that follow, this motion should be denied.

## II.  FACTUAL BACKGROUND[1]

Gnutek and Hobgood both had been employed by the Department of Revenue and assigned to the Illinois Gaming Board for a number of years.  They had consistently been considered good employees.  In fact, Gnutek's last performance evaluation indicated that he was performing his job duties at an exceptional level in nearly every category. [π's App. 367-370].

The good relationship between Gnutek & Hobgood began to change when Gnutek filed several lawsuits against various defendants involving the State of Illinois. Gnutek first filed a lawsuit against the IGB on June 30, 2006 alleging violations of Title VII's anti-retaliation provisions. [π's Fact 14].  As part of this lawsuit Gnutek provided discovery to the defense.  This discovery established that Hobgood had provided him assistance during the course of that litigation. [π's Fact 19, 20, 44, 45, 46].

On November 3, 2006, Gnutek filed a motion seeking to amend his federal lawsuit against the IGB. [π's Fact 141].  Gnutek's proposed amendment was a lengthy RICO conspiracy claim naming a prominent Illinois businessman, William Cellini, and naming Governor Blagojevich's Chief of Staff, Alonzo Monk. [π's Fact 142].  The proposed amendment was quite lengthy and it alleged that the Illinois State Police was improperly manipulating personnel decisions at the IGB. [π's Fact 142].

Within days of Gnutek's motion to amend his complaint, the IGB and Governor

---

[1]  This section is intended to simply be a brief recitation of facts that are outlined in the Rule 56.1 statement filed by Gnutek and Hobgood.  All references to "π's Fact ___" is a reference to the statements made by the plaintiffs in their Rule 56.1 statement.

Blagojevich's office were attacking the allegations and Gnutek in the media. [π's Fact 144]. The District Court denied leave to amend the complaint ruling that it would fundamentally alter the nature of the original complaint. [π's Fact 145]. Despite this stated reason for the order, the IGB told the news media that the decision showed that Gnutek's "ridiculous claims had no merit." Gnutek then dismissed his lawsuit and filed his RICO allegations in the United States District Court for the Central District of Illinois. [π's Fact 148]. That claim remains pending while the criminal indictments of both Monk and Cellini are resolved. [π's Fact 151].

**Hobgood is immediately linked to Gnutek and Gnutek's litigation**

On December 1, 2006, Mark Ostrowski, the IGB administrator, reviewed discovery that Gnutek had provided in his lawsuit. One of the documents that Ostrowski reviewed was some notes that were written by Hobgood reflecting a conversation he had with one of the decision makers from Gnutek's underlying lawsuit, Luis Tigera. [π's Fact 46]. On December 4, 2006, Ostrowski asked the IDOR's internal investigations division to conduct an investigation into the question of whether Hobgood had tape recorded his conversation with Luis Tigera. [π's Fact 47-48]. On December 5, 2006, Ostrowski had a telephone conversation with the Illinois State Police asking them to do a criminal investigation into Hobgood. [π's Fact 49]. Later Ostrowski would claim that he believed that Hobgood's document looked like a transcript and that is why he wanted the matter investigated. This is a problematic statement because at the time of the incident he testified that he never gave any consideration to whether Hobgood had accurately reflected the notes of his

conversation with Tigera ("I don't just assume because Mr. Hobgood wrote this that everything is accurate.") [π's Fact 46]. On December 11, 2006, the Governor's office was notified of this incident. [π's Fact 157].

On December 29, 2006, Hobgood was placed on an administrative leave and would not return to work until the Illinois Civil Service Commission ordered him reinstated. [π's Fact 50]. On April 27, 2006, the Illinois State Police advised the IGB and the IDOR that it had completed its investigation. In the letter the ISP stated that "[t]he investigation did not uncover any evidence to substantiate the allegations against Hobgood." [π's Fact 168].

On January 11, 2007, Hobgood was suspended for a period of fifteen days for allegedly recording a conversation he had with his supervisor. [π's Fact 43]. This decision was made by Mark Ostrowski and Joe Stratman without an investigation by internal affairs. [π's Fact 42-43]. Proper protocol, however, would require that an allegation that an employee tape recorded another employee would have to be investigated by the internal affairs division. [π's Fact 167]. Internal affairs is tasked with investigating allegations of wrongdoing on the part of IDOR employees. [π's Fact 159]. Ostrowsi has never explained why he did not follow proper protocol and have internal affairs conduct an investigation into this incident.

**The Internal Affairs Investigation of Hobgood**

While it is somewhat axiomatic, Director Hamer testified that it is "extremely important" that all internal investigations be conducted in a fair and impartial manner." [π's Fact 162]. To make sure that investigations are fair and impartial the

IDOR's internal investigations division is bound by certain policies and procedures. One of the policies that governs an internal investigation is the policy that requires a case initiation form be completed for each case within (3) days. [π's Fact 161]. The reason for such a policy is obvious, an investigation should be limited in scope and should not be a bottomless pit. Director Hamer and his Chief of Staff, Lainie Krozel, receive monthly reports from internal affairs regarding their ongoing investigations.

Despite his obligation to complete a case initiation report, Luke Hartigan did not do so as it related to the Hobgood investigation. [π's Fact 169]. Hartigan did, however, in an e-mail explain what was supposed to be the scope of his investigation as follows: "IDOR IA opened a case initiation file on 12/5/06 after receiving information from Mark Fries and Mark Ostrowski at IGB that Hobgood allegedly created a written document to file detailing a conversation between him and ISP official/supervisor Luis Tigera who is assigned to the IGB detail." [π's Fact 169].

Given that every internal affairs investigation is supposed to be fair and impartial, no decision on whether an employee is going to be disciplined is to be made until an investigation is complete. In fact, Ms. Krozel testified that it would be absolutely improper to determine discipline before an investigation is conducted because "[a]n impartial investigation has to take place before any decision is recommended." [π's Fact 158]. Despite this obvious requirement, Mark Ostrowski and IGB met with Hartigan before he actually began his investigation and told him that "IGB wants discharge to be considered as the first option." [π's Fact 158].

Thereafter, Hartigan commenced an investigation into Hobgood. [π's Fact 63].

Hartigan's investigation, however, did not merely track the allegations that Hobgood had allegedly tape recorded Luis Tigera. Rather, Hartigan's investigation was very broad based and looked into a number of different issues. Largely, however, he focused his investigation into Hobgood's relationship with Gnutek and the assistance that Hobgood provided to Gnutek in his litigation. In fact, Hartigan even requested and received copies of Hobgood's phone records to determine the frequency he placed telephone calls to John Gnutek. [π's Fact 171].

On May 30, 2007, Hartigan requested a lot of information related to Gnutek's litigation. [π's Fact 172]. As part of his investigation he conducted interviews of both Gnutek and Hobgood. Those interviews were not recorded, however, a report was made by Hartigan documenting their statements. Both Gnutek and Hobgood outlined many instances where Hartigan improperly recorded their statements in his report. [π's Fact 173, 174].

On June 14, 2007, Hartigan submitted his written investigatory report. Only a small fraction of the report reflected the original allegations against Hobgood. Hartigan greatly expanded the scope of the investigation and looked into all of the ways in which Hobgood provided assistance to Gnutek in his litigation. His report is filled with references to Hobgood having documents that were referenced in Gnutek's lawsuit. These documents included the federal indictments of Stuart Levine and Antoin Rezko, copies of Gnutek's lawsuit and his RICO amendments, and documents relating to William Cellini. [π's Fact 175]. In his conclusion he repeatedly links Hobgood to Gnutek's lawsuits and states that there was personal information

Page 6 of 35

pertaining to ISP Director Larry Trent and suggests that Hobgood provided this information to Gnutek.

**Discipline of Thomas Hobgood**

As noted *supra*, prior to the investigation being conducted Ostrowski and IGB were requesting that Hobgood's employment be terminated. [π's Fact 158]. This did not change after the report was completed. Ostrowski spoke with IDOR Director Hamer about the investigation. [π's Fact 180]. Ostrowski went as far as drafting his own set of charges against Hobgood, a task normally left to Labor Relations to handle. [π's Fact 185]. Apparently, Ostrowski was not satisfied with the charges that had been drafted by Labor Relations.

The charges Ostrowski drafted are replete with references to Hobgood's involvement in Gnutek's litigation. For example, Ostrowski references the allegation that Hobgood tape recorded his conversation with Tigera. This is implausible because Ostrowski himself states that the conversation was 40 minutes in length yet the alleged transcript contained less than 3 pages of dialogue. [π's App. 418]. Ostrowski states that "Hobgood and Gnutek both admit meeting regularly for a one to two year period of time, where Hobgood would provide information to Gnutek and Gnutek would use said confidential/unauthorized information which ended up contained in a lawsuit." [π's App. 418]. Ostrowski contends that Hobgood gave confidential information relating to Larry Trent to Gnutek. [π's App. 419]. Ostrowski contended that Hobgood gave confidential information relating to Willliam Cellini to Gnutek. [π's App. 419-420].

Hobgood was then charged with several different policy violations. Ironically,

despite pleading from Ostrowski and Krozel, Hobgood was not charged with tape recording Luis Tigera. [π's Fact 181]. Rather, Hobgood was charged with several allegations that related to assisting Gnutek, namely, information related to ISP Director Larry Trent, ISP officer Mark Stevens and William Cellini.

When he was presented with the charges, Hobgood presented evidence that he had been directed to look into the background of William Cellini. [π's Fact 189]. As a result, Labor Relations indicated that this charge would have to be removed. Despite this request, the charge was not removed. [π's Fact 189].

Ostrowski later testified about his theories regarding Hobgood. He testified that he believed that Gnutek received information from Hobgood about Larry Trent that Gnutek placed in his complaint. Specifically, Ostrowski maintained that it was the fact that Trent had previously worked for a casino owned by Ostrowski that Gnutek received from Hobgood. [π's Fact 52]. This information, however, was a matter of public record. In fact, Governor Blagojevich released this information in a press release in 2003. [π's Fact 76, π's App. 932-933]. As such, even if Hobgood shared this information with Gnutek it was information that was a matter of public record. Ostrowski also believed that Hobgood was providing confidential information about William Cellini to Gnutek. [π's Fact 84].

Hobgood's termination was reversed by the Illinois Civil Service Commission. [π's Fact 122].

**Investigation into Gnutek**

On July 13, 2007, Ostrowski requested that an internal investigation be

conducted on Gnutek. [π's Fact 190].  On August 20, 2007, the internal investigations division commenced an investigation into Gnutek. [π's Fact 192].  Unlike the investigation into Hobgood, this time a case initiation form was completed.  According to the form, the scope of the investigation was limited to "Information was received alleging Special Agent John Gnutek improperly obtained emails from Special Agent Vince Pattara's email system." [π's Fact 192].  The Gnutek investigation was assigned to Carlos Aulet to investigate. [π's Fact 193].

Aulet did not limit himself to merely investigating the specific allegations against Gnutek.  In fact, he spent most of his time trying to establish that Gnutek had faked an injury that occurred at work, despite the fact that his supervisor determined that there was not enough there to investigate. [π's Fact 194, 93].  He also conducted an investigation into allegations that Gnutek had improperly conducted audits as part of his job duties. [π's Fact 113].

On October 16, 2007, Ostrowski requested that Gnutek be disciplined. [π's Fact 191].  It was not until November 5, 2007, however, that Aulet finished his investigation. [π's Fact 191].  Gnutek was charged with many violations that included allegations that he improperly utilized confidential information relating to Larry Trent. [π's App. 1534].

Like Hobgood, the IDOR terminated Gnutek's employment.  Also like Hobgood, Gnutek was reinsted to his position of employment by the Illinois Civil Service Commission. [π's Fact 121].

### III. STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Summary judgment should be granted quite cautiously in employment

discrimination claims because questions of intent and motivation are inherently fact
driven questions that should be resolved by the trier of fact and not by a judge
presiding over a written motion.  Unfortunately, recent history shows that summary
judgment is now becoming the typical resolution of fully litigated employment
disputes.

  The suggestion that summary judgment in employment discrimination claims
should be granted sparingly is hardly a novel concept.  To the contrary, in the past our
Court of Appeals has held that:

> Summary judgment is appropriate only when the materials
> before the court demonstrate that there are no genuine
> issues of material fact and the moving party is entitled to
> judgment as a matter of law. This standard is applied with
> added rigor in employment discrimination cases, where
> intent and credibility are crucial issues. Accordingly, we
> will affirm the decision of the district court only if, had the
> record before that court been the record of a complete trial,
> the defendant would have been entitled to a directed
> verdict.  *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th
> Cir. 1993) (citations omitted); *see also Huff v. UARCO*, Inc.,
> 122 F.3d 374, 380 (7th  Cir. 1997).

These statements of heightened scrutiny in employment discrimination cases have not
been uttered merely in our Circuit.  *See  White Motor Co. v. United States*, 372 U.S. 253,
259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963) (summary judgment inappropriate "where
motive and intent play leading roles");  *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459
(9th  Cir. 1985) (courts generally cautious about granting summary judgment in Title VII
cases where intent is involved);  *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 657 (11th  Cir.
1983) ("'granting of summary judgment is especially questionable'" in employment

discrimination cases (*quoting Hayden v. First National Bank*, 595 F.2d 994, 994 (5th Cir. 1979)); *McKenzie v. Sawyer*, 684 F.2d 62, 67 (D.C. Cir. 1982) (factual disputes in most Title VII cases preclude summary judgment);

The above cited language urging restraint in the granting of summary judgment in employment cases seems to be slowly disappearing from the decisions of many Courts. The undeniable result is a marked increase in the granting of summary judgment in employment discrimination cases. *See* Patricia M. Wald, *Summary Judgment at Sixty*, 76 Tex.L.Rev. 1897, 1941 (1998) ("Its flame lit by *Matsushita, Anderson,* and *Celotex* in 1986, and fueled by the overloaded dockets of the last two decades, summary judgment has spread swiftly through the underbrush of undesirable cases, taking down some healthy trees as it goes."); *see also* Milton I. Shadur, *An Old Judge's Thoughts*, CBA Rec., January 2004, at 27, 27 ("From my perspective that trend [summary judgment] has gone much too far, to the benefit of no one involved in the justice system . . . . "); Samuel Issacharoff & George Loewenstein, "*Second Thoughts About Summary Judgment*," 100 Yale L.J. 73, 88-91 (1990). The Seventh Circuit too has noted the problem of substituting a judge's decision via summary judgment for a jury's decision at trial:

> The expanding federal caseload has contributed to a drift in many areas of federal litigation toward substituting summary judgment for trial. The drift is understandable, given caseload pressures that in combination with the Speedy Trial Act sometimes make it difficult to find time for civil trials in the busier federal districts. But it must be resisted unless and until Rule 56 is modified (so far as the Seventh Amendment permits) to bring federal practice

> closer to the practice in the legal systems of Continental
> Europe, where there is no hard and fast line between
> pretrial and trial and where procedure is more summary
> and informal than in the United States. *Wallace v. SMC
> Pneumatics*, 103 F.3d 1394, 1397 (7th Cir. 1997).

When issues of motivation are involved summary judgment should rarely be granted

in order to remain consistent with the spirit of the Seventh Amendment, and the

Supreme Court's decision in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct.

2505, 2512 (1986).  In *Anderson,* the Supreme Court analyzed what trial judges should

look at when determining whether to grant a Rule 56 motion for summary judgment.

In this respect, the Court held:

> . . . . . we are convinced that the inquiry involved in a ruling
> on a motion for summary judgment or for a directed verdict
> necessarily implicates the substantive evidentiary standard
> of proof that would apply at the trial on the merits.  If the
> defendant in a run-of-the-mill civil case moves for summary
> judgment or for a directed verdict based on the lack of proof
> of a material fact, the judge must ask himself not whether he
> thinks the evidence unmistakably favors one side or the
> other but whether a fair-minded jury could return a verdict
> for the plaintiff on the evidence presented.  The mere
> existence of a scintilla of evidence in support of the
> plaintiff's position will be insufficient; there must be
> evidence on which the jury could reasonably find for the
> plaintiff.  The judge's inquiry, therefore, unavoidably asks
> whether reasonable jurors could find by a preponderance of
> the evidence that the plaintiff is entitled to a verdict --
> 'whether there is [evidence] upon which a jury can properly
> proceed to find a verdict for the party producing it, upon
> whom the *onus* of proof is imposed.'  *Id.*

## IV. ARGUMENT

**A.    Summary Judgment Standards have Become Abusive to Plaintiffs in
Employment Discrimination and Retaliation Claims**

While the Seventh Circuit and this Court have certainly approved of the practice, the undeniable reality is that the current practice of summary judgment in this Circuit (and others) in employment discrimination or retaliation claims is impermissibly violating the Seventh Amendment rights of many litigants. Prior to the 1986 Supreme Court trilogy of summary judgment decisions,[2] the prevailing view was that summary judgment, particularly in employment discrimination cases, was a largely unfavored practice. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir. 1986)(Noting that "[b]ecause of the relative ease with which a prima facie case of employment discrimination may be made and the factual complexities inherent in Title VII litigation, summary judgment, although certainly available, is generally not favored in Title VII cases."); *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976) ("[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles").[3] That view has changed substantially and the prevailing view would seem to be best articulated by the First Circuit, "Over time, summary judgment has proven its

---

[2] The three decisions are: *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). For an excellent review of the holdings of these three cases *see* Arthur R. Miller, *The Pretrial Rush to Judgment: are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding our Day in Court and Jury Trial Commitments*, 78 NEW YORK UNIVERSITY LAW REVIEW 982, 1029-43 (2003).

[3] This general view is summed up best by a sign that hung from a rural Alabama courthouse that read "No Spittin,' No Cussin' and No Summary Judgment." Susan T. Wall, *"No Spittin,' No Cussin' and No Summary Judgment": Rethinking Motion Practice*, S.C. LAW., June 1997, at 29.

usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).

As the Third Circuit recognized in *Doe v. Abington Friends School*, 480 F.3d 252, 258, (3rd Cir. 2007), "[s]ince the Supreme Court removed the [summary] judgment procedure from disfavored status in the 1980's, some have opined that the pendulum has swung too far in the opposite direction." In a dissent, Judge Bennett, in *Kampouris v. St. Louis Symphony Society*, 210 F.3d 845, 849-50 (8th Cir. 2000), wrote:

> I conclude that the record before the district court shows that there are genuine issues as to material facts in this case, and that the moving party was not entitled to a judgment as a matter of law, see Fed. R. Civ. P. 56©), and the district court was not entitled to disregard or decide those factual issues by rendering an ultimate decision on the merits. Instead, the district court should have shown the plaintiff in this employment discrimination case the deference he was due. This is precisely the kind of case in which the district court should have exercised caution in granting summary judgment, because the evidence could indeed support reasonable inferences for the nonmovant.
>
> Furthermore, as the Supreme Court said in *Jacob v. New York*, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942), "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." *Jacob*, 315 U.S. at 752-753, 62 S.Ct. 854. The district court's grant of summary judgment in this case failed to guard jealously Mr. Kampouris's statutory right to trial by jury under the ADA. See 42 U.S.C. § 1981a.

The First Congress's passage of the Seventh Amendment in 1789 and the 102nd Congress's passage of 42 U.S.C. § 1981 in 1991 reflect two centuries of deep and abiding faith in trial by jury.  More than that, constitutional and statutory mandates for trial by jury reflect an immutable preference that certain matters, such as Mr. Kampouris's rights under the ADA, be left to the collective judgment of a jury of peers, rather than reposed in a single, albeit industrious and well-meaning, district court judge.

The federal courts' daily ritual of trial court grants and appellate court affirmances of summary judgment in employment discrimination cases across the land is increasingly troubling to me. I worry that the expanding use of summary judgment, particularly in federal employment discrimination litigation, raises the ominous specter of serious erosion of the "fundamental and sacred" right of trial by jury.

Indeed, the pendulum has swung too far.  District Court Judge Nancy Gertner discussed her views of this unfortunate shift in an address to the Massachusetts Bar Association in 2007:

Simplistic, heuristic devices and formulaic approaches have led to an extraordinary rate of defendant decisions on summary judgment. In part, I suggest, this is the pressure of the docket. Discrimination claims have tripled over the last twenty years. And since they are so fact-bound, they take up multiple trial days. Clearly, some judges simply want to be rid of them. When I was a "baby judge" I attended a training session. The trainer was to address employment discrimination cases. He began his presentation with: "Here's how you can get rid of these cases ..." and he was not talking about plaintiff's verdicts. Gender Bias Task Forces from the Ninth and Eight Circuits reported that judges were impatient with sex-based employment discrimination claims.... Summary judgment has transformed employment discrimination law, not just because it is necessarily eliminates jury trials but because it has transformed the *substantive* law of discrimination. Let me underscore that-under the guise of summary judgment,

Page 15 of  35

> judges, not juries, are completely reshaping discrimination
> law-what kinds of sexual comments are harassing, what
> kinds of racist epithets count as discriminatory, what
> environments disadvantage even the most reasonable of
> women, what kinds of words connote discrimination. *In re
> One Star Class Sloop Sailboat Build in 1930 with Hull Number
> 721, Named "Flash"*, 517 F.Supp.2d 546, 555 (D. Mass.,
> 2007)(Young, J.).

The seemingly instinctive trend of granting judgment in employment cases must

be reversed.

### i. Granting Summary Judgment on the issue of causation in an Employment Discrimination/Retaliation claim violates a Plaintiffs Rights Under the Seventh Amendment[4]

The Seventh Amendment to the United States Constitution reads:

> In Suits at common law, where the value in controversy
> shall exceed twenty dollars, the right of trial by jury shall be
> preserved, and no fact tried by a jury shall be otherwise
> reexamined in any Court of the United States, other than
> according to the rules of the common law.

Justice Black explained the fundamental right to a jury trial as expressed in the Seventh

Amendment as follows:

> The right to confront, cross-examine and impeach adverse
> witnesses is one of the most fundamental rights sought to be
> preserved by the Seventh Amendment provision for jury
> trials in civil cases. The advantages of trial before a live jury
> with live witnesses , and all the possibilities of considering
> the human factors, should not be eliminated by substituting
> trial by affidavit and the sterile bareness of summary
> judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 176, 90

---

[4]Gnutek and Hobgood understand that this Court is unlikely to conclude that granting summary judgment on the issue of causation in an employment discrimination claim violates the Seventh Amendment. Nonetheless, Gnutek and Hobgood do not want to waive the issue.

S.Ct. 1598, 26 L.Ed.2d 142 (1970)(Black, J., concurring).

Despite the language of the Seventh Amendment, Courts have become increasingly willing to grant summary judgment in employment claims when the sole question is how much evidence is necessary to establish causation. [See *supra* Section IV(A)]. A number of commentators have begun to question whether the grant of summary judgment are violating plaintiff's rights under the Seventh Amendment. *See* Patricia Wald, *Summary Judgment at Sixty*, 76 TEX. L. REV. 1897 (1998); Stephen B. Burbank, *Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?*, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 591 (2004); Adam N. Steinman, *The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years after the Trilogy*, 63 WASH. & LEE L. REV. 81 (2006); Suja A. Thomas, *Why Summary Judgment is Unconstitutional*, 93 VIRGINIA L. REV. 139 (2007); and Suja A. Thomas, *Why Summary Judgment is Still Unconstitutional: A Reply to Professors Brunet and Nelson*, 93 IOWA L. REV. 5 (2008).

Causation is a question of fact and the Seventh Amendment mandates that factual questions must be decided by a jury and not a Court reviewing a summary judgment motion.

## B.     *Res judicata* **does not bar Gnutek's claims**

The first argument advanced by the Defendants is that Counts III and IV, Gnutek's claims, must be dismissed under the doctrine of *res judicata* or claim preclusion. The Defendants correctly note that *res judicata* will bar a claim if three

separate factors are established: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of causes of action; and (3) an identity of parties or their privies. The Defendants analysis of these prongs is incorrect.

### 1. There is no privity

The Defendants cite solely to *Mandarino v. Pollard*, 718 F.2d 845, 850 (7th Cir. 1983), for the proposition that "[a] government and its officers are in privity for purposes of *res judciata*." [See Doc. 117, p. 10]. Subsequent decisions of the Seventh Circuit establish that the *Mandarino* decision is a limited holding that is inapplicable to this case.

In *Conner v. Reinhard*, 847 F.2d 384, 394 -96 (7th Cir. 1988), the Court addressed the question of whether a governmental employee who is sued in his personal capacity can be considered to be in privity with its employer. The Court explained that lawsuits against governmental actors acting in their official capacity are quite different from lawsuits against governmental actors who are acting in their individual capacity. The Court cited to WRIGHT & MILLER'S treatise that holds "The relationships between a government and its officials justify preclusion only as to litigation undertaken in an official capacity. Thus a judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials." *Id.* at 395.

In *Conner* the Court specifically addressed the *Mandarino* opinion and held that:

> To the extent that the *Mandarino* opinion suggests that officials sued in their personal capacities are necessarily in privity with the government, we cannot agree. *Id.* at 396.

The Court addressed this same issue in *Gray v. Lacke*, 885 F.2d 399, 405 (7th Cir. 1989). In Gray, the Court again specifically concluded that government actors sued in their individual capacities are not in privity with the government that employs them.

In this complaint, Gnutek and Hobgood have identified the named defendants in their individual capacities. As a result, res judicata does not bar Gnutek's claim.

### 2.    There is no final judgment

There is no final judgment that would preclude this claim. Both the Illinois Department of Revenue and Gnutek have appealed the decision of the Will County Circuit Court and those claims have not yet been resolved on appeal. [See π's Fact 123].[5] As a result, res judicata is not appropriate.

### C.    The Title VII retaliation claims against the Department and the IGB

Title VII of the Civil Rights Act of 1964 not only prohibits discrimination, it also prohibits retaliation. Specifically, Title VII provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

Like other claims brought under Title VII, a plaintiff advancing a retaliation claim can rely upon either the direct or indirect method of proof. *See generally Rhodes v. Illinois*

---

[5] As it relates to Gnutek's Title VII claim, he was not allowed to fully advance this claim before the Civil Service Commission. [See π's Fact 119]. *See Jones v. City of Alton, Illinois*, 757 F.2d 878 (7th Cir. 1985).

*Department of Transportation*, 359 F.3d 498, 508 (7th Cir. 2004).

Our Circuit has outlined two separate balancing tests that can be used by plaintiffs in a Title VII retaliation claim. The first, the indirect method, requires a plaintiff to show that (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

Under *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003), a plaintiff can establish a direct case of discrimination by presenting evidence of: (1) a statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the two. *See also Moser v. Indiana Department of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005); *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002). It is this second approach upon which Gnutek and Hobgood rely.

### 1.    Both Gnutek and Hobgood are proceeding under the direct method

In *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir. 1994), our Court of Appeals first acknowledged that there were two separate ways a plaintiff could proceed under the "direct method" rather than relying upon the indirect method of proof. The Court explained that a plaintiff can present either direct evidence or circumstantial evidence in order to adequately state a claim. *Id.*

In *Sylvester v. SOS Children's Villages Illinois, Inc.* 453 F.3d 900, 904 (7th Cir. 2006),

the Court explained that:

> . . . it was not the intention in *Troupe* to promulgate a new standard,
> whereby circumstantial evidence in a discrimination or retaliation
> case must, if it is to preclude summary judgment for the defendant,
> have a mosaiac-like character. There is no rich mosaic of
> circumstantial evidence in this case, but there is enough
> (though maybe barely enough) to preclude summary judgment.

In their brief, the Defendants have confused the concepts of "direct proof" and "direct evidence." In *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003), the Court explained that the concepts of "direct proof" and "direct evidence" are oftentimes conflated, however, they are separate concepts. In so doing the Court concluded that "[w]hile the terms 'direct method' and 'direct evidence' are similar, we reemphasize here that use of direct evidence is merely one of two means (the other being the use of circumstantial evidence) of proceeding under the direct method."

In *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720- 721 (7th Cir. 2005), the Court outlined the types of circumstantial evidence of discrimination sufficient to establish a direct case can include "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." In short, under the "direct method" a plaintiff can proceed by relying upon circumstantial evidence that requires inferences to be drawn.

## A.    Hobgood's Title VII retaliation claim

As the defendants note, Hobgood alleges three separate instances of retaliation: (1) an abusive investigation; (2) suspension from his employment; and (3) termination.

Page 21 of  35

Proceeding under the direct method, Hobgood must present evidence from which a jury could reasonably conclude each of the following: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002).[6]

The defendant's do not seriously contest the fact that Hobgood's assisting Gnutek resulted in: (1) the investigation; (2) his suspension; and (3) his termination. Quite simply, they can not. Had Gnutek not filed his lawsuit or had Hobgood provided no assistance to him, none of those things would have occurred. Rather, the defendants appear to be arguing that Hobgood's suspension, the investigation and his ultimate termination were caused because he engaged in activities that were not

_____

[6] In *Shager v. UpJohn*, 913 F.2d 398, 402 (7th Cir. 2000), the Seventh Circuit made it clear that once a plaintiff has submitted sufficient evidence under direct theory the employee does not need to present evidence of pretext:

> A plaintiff who makes such a case in resisting the defendant's motion for summary judgment does not need the help of *McDonnell Douglas* to resist the motion. He walks as it were without crutches. For he has presented enough evidence to defeat a motion for summary judgment under the general test for the grant of such a motion, alluded to at the outset of this opinion: if this were the trial rather than a summary judgment proceeding, would the judge be required to grant a directed verdict to the party seeking summary judgment?

*See also Rudin*, 420 F.3d at 724 (holding that she had presented sufficient circumstantial evidence of discriminatory intent to proceed to a trial); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d at 905 (once circumstantial evidence has been established "[n]o more is necessary" to survive summary judgment).

statutorily protected.  In this respect, they contend that Hobgood "obtained confidential work information and provided it to Gnutek for his lawsuit."  They contend that Hobgood's actions of taking confidential work information and providing it to Gnutek, while technically assistance under the act, is not statutorily protected.  The problem with this argument is two-fold: (1) there is a question of fact as to whether Hobgood was subjected to these actions because he took confidential work information;  and (2) even if he did, there is a question of whether this action is protected.

There are many pieces of evidence from which a jury could conclude that Hobgood was not disciplined because he gave Gnutek confidential work material. First, there is a factual question as to whether Hobgood ever intentionally gave anything to Gnutek that was confidential.  Hobgood disputes this fact and there has never been any finding to the contrary.  There are other pieces of evidence as well.

### 1.  Ostrowski specifically requested Hobgood be terminated before an investigation was ever commenced

One of the most damaging pieces of evidence against the IDOR and IGB is the fact that Ostrowski told Hartigan that he wanted Hobgood terminated before an investigation was ever conducted. [π's Fact 158].  This is evidence that the defendants never had any interest in a legitimate investigation into allegations of misconduct as to Hobgood.  A jury could certainly reasonably conclude that an employer who was interested in a fair and impartial decision would not be advocating for a specific type of disicpline before an investigation has even commenced.

### 2. Hartigan failed to comply with IDOR policy when he conducted the investigation

A second damaging piece of evidence is that Hartigan completely failed to comply with policies and procedures relating to an internal investigation. In *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 723 (7th Cir. 2005), the Court found that an employer departing from its own internal policies constitutes circumstantial evidence of discrimination. In *Rudin*, the community college did not comply with its internal hiring guidelines. The Court found that "[t]his systematic abandonment of its hiring policies is circumstantial evidence of discrimination." *Id.*

*Rudin* is not the first time the Seventh Circuit has explained the inferences that can be drawn from the failure of an employer to follow its internal policies. *See Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992); *See also Floyd v. State of Missouri Department of Social Services*, 188 F.3d 932, 937 (8th Cir. 1999), (holding that "[a]n employer's failure to follow its own policies may support an inference of pretext."); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)("departure from internal hiring procedures is a factor that the trier of fact may deem probative."); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006)(In an FMLA retaliation claim the Court determined that the fact that a separation document was supposed to be prepared within two days of termination but was not prepared for six days was evidence of discrimination).

In *Giacoletto*, the Court found:

When [defendant] terminated him, it failed to comply with

> its own procedures for terminating employees. For
> example, [defendant] did not counsel [plaintiff] that his
> work had fallen below acceptable levels, develop a plan to
> bring his performance up to acceptable levels, or keep a
> written record of any counseling sessions. . . . The jury could
> reasonably have concluded that because [defendant]
> neglected to follow the procedures for helping employees to
> overcome their deficiencies, the company had fired
> [plaintiff] not because of his asserted deficiencies, but [for an
> unlawful reason]. *Id.*

Hartigan violated internal investigations policy in a number of different ways.

First, he did not create a case initiation form as he was required to do. [π's Fact 161,

169]. Hartigan was obligated to accurately report information that was relayed to him

by witnesses. Hartigan made inaccurate statements as it related to the interviews he

conducted on Gnutek and Hobgood. [π's Fact 173, 174].

### 3. Hartigan's report and Ostrowski's recommendations are replete with references to Gnutek's lawsuit

A third reason that a jury could conclude that the real reason for Hobgood's

termination was retaliation for legitimate assistance that he provided to Gnutek is

because of the documentation drafted by both Hartigan and Ostrowski.

Hartigan's investigation is laced with references to Gnutek's lawsuits. Most of

these references have absolutely nothing to do with an investigation into whether

Hobgood tape recorded Luis Tigera. [See π's Fact 175]

### 4. Hartigan's investigation was much broader than the original charges

The rules provide that an investigation is supposed to have a case initiation sheet

that will set the parameters of an investigation. The reason for this is obvious. It is

important that an investigation not be a license to rummage through an employee's background in the hopes that you find something, anything on them.

Even though Hartigan did not create the case initiation form, he did initially establish parameters of the investigation. According to his March 2, 2007, e-mail to the Office of Executive Inspector General Hartigan's investigation was limited to investigating whether Hobgood had tape recorded Luis Tigera. [π's Fact 169]. In the end, this was only a small portion of his investigation. His investigation looked into all aspects of Hobgood's employment. He wanted to assess how often Hobgood was speaking with Gnutek on the telephone. [π's Fact 171]. He even tried to make a case that Hobgood was improperly calculating the mileage on his vehicle.

### 5. Despite the fact that Hobgood clearly established certain allegations were not true he was charged with them anyway

Hobgood clearly established that he had not improperly investigated William Cellini. [π's Fact 56]. Despite this fact, he was charged with this. [π's Fact 189].

### 6. Hobgood has established that he was treated differently than others

Hobgood was placed on administrative leave from his employment on December 29, 2006. The reason for the suspension was because he was being investigated for criminal misconduct. [π's Fact 50]. This decision was signed off on by Director Hamer and Chief of Staff Krozel. The problem is that Carlos Aulet was under a similar investigation. Aulet was alleged to have illegally conducted LEADS searches and a criminal investigation was initiated with the Illinois State Police. [π's Fact 196-199]. Unlike Hobgood, Aulet was not removed from his position pending the

investigation. [π's Fact 201].  This decision was made by Krozel and Hamer and John

Chambers. [π's Fact 202].

The difference, of course, is that the Illinois State Police concluded that there was

no evidence that Hobgood had committed wrongdoing.  Conversely, the ISP concluded

that Aulet had violated the law and ultimately Aulet was convicted of a felony. [π's

Fact 203].

### 7. Hobgood's 15 day suspension was not handled properly

Hobgood was given a 15 day suspension on January 11, 2007. [π's Fact 43].  The

suspension was largely related to allegations that he tape recorded his supervisor, Joe

Stratman.  If this were true, it would be the type of a policy violation that the Internal

Investigations Division should investigate. [π's Fact 167].  There was no investigation

and the decision on discipline was largely made by Ostrowski and his subordinate, Joe

Stratman. [π's Fact 43].  This conclusion was later used by Ostrowski as an aggravating

factor.

### 8. The Stevens OAR is not a significant issue

The defendants seem to argue that Hobgood acting as a courier and taking the

Stevens OAR to Gnutek from Tamayo is a significant issue.  The reality is that it is not.

If it had been a significant issue it would have been part of the initial investigation.  It

was not.  A jury could reasonably conclude that it was an after thought.  It was an

allegation that was thrown out simply in the hopes that something would stick.

The other question is even if Hobgood technically violated a policy was the

decision to discharge a more severe form of punishment than what he would have

received had he not assisted Gnutek. Obviously the Civil Service Commission thought that this was the case. In *Sheehan v. Donlen Corporation*, 173 F.3d 1039, 1048 (7th Cir. 1999), the Seventh Circuit addressed this issue. The Court concluded that often times employers create justifications to terminate after the fact that do not necessarily correspond with their typical decisions. The court quoted the Ninth Circuit decision in *O'Day v. McDonnell Douglas Helicopter Company*, 79 F.3d 756, 759 (9th Cir. 1996), for the propisition that "the inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge for certain misconduct while in practice they do not."[7] The Court also cited to the Supreme Court's decision in *Price Waterhouse*, 490 U.S. at 252, "Proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made."

The reality remains that the allegations that were ultimately brought against Hobgood were relatively trivial. They involved taking a document that merely reflected something everyone knew and giving it to Gnutek.

### 9. Ostrowski and Krozel continued to push to have Hobgood charged with tape recording Tigera

The evidence was fairly conclusive that Hobgood did not tape record his conversation with Tigera. First, there was absolutely no evidence to support this contention. Second, the ISP determined that there was no evidence to support this

---

[7] This is also true with the allegations that Gnutek conducted an unauthorized audit at the Empress Casino. There has never been any evidence offered that this was somehow inappropriate. [See Fact 113].

allegation. [π's Fact 168]. Third, according to Ostrowski the conversation between Hobgood and Tigera lasted for forty minutes. Despite this fact the alleged transcript was less than three pages in length. Ostrowski also stated that he never even considered if the statements Hobgood included in his memo accurately reflected the conversation he had with Tigera.

Despite all of these facts, Ostrowski and Krozel repeatedly attempted to get this included as one of the charges against Hobgood. [π's Fact 181].

At this stage Hobgood is only required to present evidence from which a jury could find in his favor. These pieces of evidence are certainly sufficient to create a triable issue of fact as to whether he was retaliated against in violation of exercising his rights to assist Gnutek in his Title VII proceeding.

### B.     Gnutek's Title VII retaliation claim

Like Hobgood, Gnutek proceeds under the direct method of proof. The Defendants do not contest the fact that Gnutek engaged in a protected activity and that he suffered an adverse employment action. Rather, they contend that there is insufficient evidence from which a jury could conclude that he was retaliated against for exercising his rights.

Like the investigation into Hobgood, the internal investigation into Gnutek grossly exceeded the intended scope. [π's Fact 192-196]. Throughout the course of the investigation Aulet investigated many different issues. Aulet looked into whether Gnutek had faked his own injury. [π's Fact 194]. This went as far as expressing frustration that he was not able to conduct surveillance of Gnutek at his father's

funeral.  [π's Fact 194].

Throughout his investigation Aulet continually references the Gnutek matter as a "sensitive" matter. [π's Fact 193].  Further, the tie-in with Hobgood is unmistakable.  In fact, immediately after Ostrowski wrote his own charges against Hobgood, the Internal Investigations division wrote back "[t]he tie-in with Gnutek needless to say plays an important role and has been documented quite well consequently being useful in the very near future." [π's Fact 186].  This demonstrates that they had already decided to get rid of Gnutek despite the fact that the investigation had not yet been completed.

The IDOR has expressly admitted that it was disciplining Gnutek for using the Stevens OAR in his own lawsuit. [See Fact 103].  Gnutek, however, received this document from the Administrator Jeanette Tamayo and she had the authority to release the document.  In short, they are acknowledging disciplining Gnutek for something that is appropriate.  Further, the Civil Service Commission concluded that this was not terribly significant.[8]

### D.    Gnutek and Hobgood's First Amendment Claims

As the defendants note, the analysis is largely similar between the First

---

[8]  Clearly Ostrowski did not perceive it to be terribly significant because he signed off on Gnutek's personnel evaluation that had makred him as exceptional in nearly every category shortly after he saw this document.

Amendment claims and the Title VII retaliation claim as it relates to the issue of causation. Those previous arguments are incorporated herein. There are, however, some additional arguments raised that warrant a response.

### 1. Hobgood engaged in protected speech

The defendants contend that Hobgood did not engage in protected speech because "[t]hou he may have wanted to assist Gnutek, Hobgood's intention clearly was not to speak to the general public." It would appear as though they are suggesting that an individual must speak to the general public in order for their speech to be considered protected. This is simply not an accurate statement of law. In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court explained that First Amendment protection is available to public employees who privately engage in speech regarding public concerns. The plaintiff, Bessie Givhan, was a public school teacher who frequently complained about various school policies, primarily racial segregation. Givhan presented her objections to the school principal in his private office during the school day. 439 U.S. at 412, 99 S.Ct. at 694. The Court concluded that Givhan's speech was entitled to First Amendment protection. 439 U.S. at 414-15, 99 S.Ct. at 695-97. Specifically, the Court held:

> The First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

*Conner v. Reinhard*, 847 F.2d 384, 392 (7th Cir. 1988)(noting "*Givhan* implicitly held that

first amendment protection extends to public employees who express their opinions during working hours as well as those who engage in speech while off-duty"); *Hulbert v. Wilhelm*, 120 F.3d 648, 654 (7th Cir.1997) (noting that the plaintiff-was, if anything, to be commended for attempting to go through established internal channels).

Clearly Hobgood did not speak out in a public forum but the First Amendment does not require him to do so. Further, the investigatory file clearly links Gnutek and Hobgood together. The references are replete with documents that very clearly reference matters of public concern, *i.e.*, the Levine and Rezko indictments and other matters of public record.

### 2. Gnutek engaged in protected speech

The defendants do not really argue that filing a lawsuit is not protected speech. Nonetheless, they allude to such an argument. This issue, however, has already been fully briefed to this Court. Rather than restating his previous arguments, Gnutek and Hobgood merely incorporate those previous arguments. [See Doc. 28].

### 3. A jury could reasonably conclude that Gnutek's termination was not because of allegations that he engaged in misconduct but rather because he filed his RICO complaint

The defendants contend that Gnutek's discipline did not stem from the filing of his RICO allegations but rather because he violated IDOR policies and procedures. This is a question of causation and, for the reasons stated above, a jury could reasonably conclude that the real reason Gnutek was terminated was because of his RICO filings.

The defendants argue that they believed that Gnutek was relying upon

confidential information when he prepared his complaints and this is what caused his termination. [See brief, p. 26]. This is simply not an accurate statement. In fact, the only confidential information he was charged with possessing was information relating to William Cellini. He was charged with some fairly trivial issues that had nothing to do with disclosing confidential information.

Ostrowski and Krozel created a fanciful story that Hobgood was feeding confidential information to Gnutek for him to include in his lawsuits. Gnutek and Hobgood were working in collaboration but their was nothing inappropriate exchanged between the two. Despite this fact, Krozel and Ostrowski continue to insist that Hobgood gave Gnutek confidential information relating to William Cellini and Larry Trent and that Gnutek used it in his lawsuit. [π's Fact 52]. The problem is they have never had any evidence to support this conclusion. Based upon these facts, a jury could conclude that it was Gnutek's RICO allegations that subjected him to retaliation. This is all that he needs to show at this point.

**E.    The Individual Defendants are not entitled to qualified immunity**

The qualified immunity analysis essentially asks the question of whether a reasonable public official would have understood that their actions were unlawful. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039. Qualified immunity protects from civil liability those who perform discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It has long been known that a supervisory employee can

not retaliate against an employee who engages in protected speech.  For this reason,

qualified immunity does not shield the defendants from liability in this case.

In *Miller v. Jones*, 444 F.3d 929  (7th Cir. 2006), our Court of Appeals specifically

noted that:

> It is well established by the Supreme Court and this circuit
> that a public employer may not retaliate against an
> employee who exercises his First Amendment speech rights.
> *See Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708;
> *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997)(holding
> that "[i]t has been well established for many years in this
> Circuit that a public employer may not retaliate against an
> employee who exercises his First Amendment speech
> rights."); *McGill v. Board of Education of Pekin Elementary
> School District Number 108*, 602 F.2d 774, 780 (7th Cir. 1979).

In *Auriemma v. Rice*, 910 F.2d 1449, 1460-61 (7th Cir. 1990), the Seventh Circuit

recognized that a private lawsuit can be protected speech.  (See Generally Doc. 28, p. 6-

10).

## V. Conclusion

For the foregoing reasons, the motions for summary judgment should be denied

in their entirety.

John Gnutek & Thomas Hobgood

By: /s/ John A. Baker
    Their Attorney


John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:   (217) 522-8234

Facsimile:    (217) 522-8234
E-mail:      johnbakerlaw@sbclgobal.net

**Certificate of Service**

      This document was filed by utilizing the ECF system. A copy will automatically be forwarded to all counsel of record.  No copies have been sent via U.S. Mail.

             John Gnutek & Thomas Hobgood


             By: /s/ John A. Baker
                  Their Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:   (217) 522-8234
Facsimile:    (217) 522-8234
E-mail:      johnbakerlaw@sbclgobal.net