UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN GNUTEK and THOMAS HOBGOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 5516 |
| | ) | |
| ILLINOIS GAMING BOARD, ILLINOIS | ) | Judge Rebecca R. Pallmeyer |
| DEPARTMENT OF REVENUE, MARK | ) | |
| OSTROSKI, BRIAN HAMER, LAINIE | ) | |
| KROZEL, LUKE HARTIGAN and | ) | |
| CARLOS AULET, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs John Gnutek ("Gnutek") and Thomas Hobgood ("Hobgood") are former employees of the Illinois Department of Revenue ("IDOR") who were assigned to work at the Illinois Gaming Board ("IGB"). In June 2006, Gnutek filed a lawsuit alleging that the IGB retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), for a previous sex discrimination charge. Hobgood helped Gnutek draft his complaint to outline what Plaintiffs describe as a "pattern of corruption" within the IGB. (Am. Compl. ¶ 29.) Plaintiffs allege that soon after Gnutek filed his amended complaint, several officials from the IDOR and IGB began a "campaign of retaliation" against both Gnutek and Hobgood. (*Id.* ¶ 33.) Specifically, Plaintiffs were subject to investigations by IDOR's Internal Affairs Division, were suspended, and ultimately, were terminated.[1] Plaintiffs subsequently brought the instant suit against IDOR; IGB; IDOR Director Brian Hamer; IGB Administrator Mark Ostrowski; IDOR Chief of Staff, Lainie Krozel; and two former IDOR Internal Affairs investigators, Luke Hartigan and Carlos Aulet (collectively, "Defendants"). Plaintiffs' four-count Amended Complaint alleges that the IDOR, IGB, and the individual officers

---

[1] Hobgood and Gnutek were terminated by the IDOR in December 2007 and March 2008, respectively. Both appealed their terminations to the Illinois Civil Service Commission. As described *infra*, in November 2008, the Commission reinstated Hobgood; in March 2009, the Commission reinstated Gnutek.

retaliated against them in violation of Title VII (Counts I & IV) and the First Amendment (Counts II & III). Defendants move for summary judgment on all counts. For the reasons stated below, Defendants' motion for summary judgment is granted.

<u>BACKGROUND</u>

I.    **The Parties**

The Illinois Gaming Board is a five-member board that regulates all gambling activity at nine casinos in Illinois under the Illinois Riverboat Gambling Act, 230 ILCS 10/1, *et seq.* (Defs.' 56.1 ¶ 2.) Until July 2009, the IGB operated within the Illinois Department of Revenue; it is now a separate and independent body of the State of Illinois. (*Id.* ¶ 5.) In January 1999, Gnutek began working in the Enforcement Division of the IGB as a Revenue Senior Special Agent at the Empress Casino in Joliet, Illinois. (*Id.* ¶ 9.) Hobgood has been employed in the Investigations Division of the IGB since December 16, 2002, also as a Revenue Senior Special Agent. (*Id.* ¶ 8.) The Enforcement Division of the IGB monitors the day-to-day activity at the nine riverboat casino dock sites; the Investigations Division investigates any illegal activity that occurs on riverboats and performs background investigations on entities applying for gambling licenses. (*Id.* ¶ 6.)

Defendant Brian Hamer has been the Director of the IDOR since February 2003. (Ostrowski Aff. ¶ 1.) Defendant Lainie Krozel has served as Chief of Staff for the IDOR since March 2007. (Krozel Aff. ¶ 4.) Defendant Mark Ostrowski has served as Administrator of IGB since November 2005. (Ostrowski Aff. ¶ 1.) Defendant Luke Hartigan was the Chief Investigator in the Internal Affairs Division of IDOR from 2004 to 2007. (Hartigan Aff. ¶ 1.) Defendant Carlos Aulet worked as an investigator in Internal Affairs from August 2000 to February 2009. (Aulet Aff. ¶ 1.)

II.   **Plaintiff Gnutek's 2006 Lawsuit**

On June 30, 2006, Gnutek brought a Title VII retaliation claim against IGB. (Am. Compl. ¶ 19.) *See Gnutek v. Illinois Gaming Board*, No. 06 C 3561 (N.D. Ill. filed June 30, 2006) (Castillo, J.). He alleged that the IGB retaliated against him for filing a previous complaint of sex

discrimination with the Illinois Department of Labor in June 2004. (Gnutek Dep. 39-41.) According to Gnutek, the IGB retaliated by failing to promote him to Enforcement Operations Supervisor in 2005, instead selecting Mark Stevens, an Illinois State Police Master Sergeant, for the position. (Defs.' 56.1 ¶ 15.) At some point (Hobgood does not recall exactly when), Hobgood assisted Gnutek in drafting his 2006 complaint by advising him on more persuasive ways to organize his facts and exhibits. (Hobgood Dep. 33-34.) Hobgood also provided Gnutek with certain documents to "further his claims" against the IGB. (Hobgood Dep. 34; Am. Compl. ¶ 20.) Hobgood recalls specifically giving Gnutek a rejection letter that Hobgood received from the IDOR stating that Hobgood, too, was passed over for promotion to Enforcement Operations Supervisor. (Hobgood Dep. 34.) Hobgood claims he hoped Gnutek could use the rejection letter in his lawsuit "to show a disparate treatment" among those applicants who applied for the supervisor position. (*Id.* 34-35.) (Plaintiffs do not explain how the fact that Hobgood, like Gnutek, was passed over for the promotion establishes a pattern of disparate treatment.) Hobgood claims he did not discuss his assistance to Gnutek with any other IGB employees. (*Id.* 66.)

Sometime between June 2006 and November 2006, Hobgood claims that he and Gnutek observed increasingly politicized hiring decisions at the IGB in conjunction with inappropriate campaign contributions to then-Illinois Governor Rod Blagojevich.[2] (*Id.* 54.) Hobgood claims that as he and Gnutek began to "notice [a] pattern of [illegal] behavior" at the IGB, they discussed how best to proceed and concluded that certain actions by IGB officials met the definition of racketeering. (*Id.* 54-56.) During this period of time, Hobgood also spoke with Jeannette Tamayo—then interim administrator at the IGB—to express his concerns about IGB's hiring practices, and informed her that Gnutek had retained the services of an attorney (though he did not

---

[2]     Hobgood does not identify who participated in the political hiring decisions at the IGB, nor who at the IGB made contributions to the Blagojevich campaign.

tell her why).[3]  (*Id.* 58, 60.)

At some point later, Tamayo gave Hobgood a large, sealed envelope and asked him to deliver it to Gnutek.  (*Id.* 62.)  Though curious about the contents of the package, Hobgood claims he did not open it and delivered it to Gnutek sealed.  Hobgood recalled later learning of the contents of Tamayo's package, though he cannot remember how or when.  (Hobgood Dep. 64-65.) According to Gnutek, the package of documents from Tamayo contained copies of "numerous e-mails that related to hiring irregularities at the [IDOR and IGB]" (Gnutek Dep. 108, 120-21), as well as an internal IGB document entitled, "Officer Action Request" ("OAR") regarding Mark Stevens. (*Id.* 107.)  Plaintiffs offer no specifics concerning the "hiring irregularities" revealed in the e-mail messages.  The exact contents and purpose of Stevens' OAR are also not described in the record, but it is undisputed that the OAR contained personal information about Mr. Stevens, including his Social Security number.  (Ostrowski Aff. ¶ 16.)  Gnutek also recalls receiving a separate memorandum from Hobgood describing an October 2005 conversation between Hobgood and Luis Tigera—former Deputy Administrator of the Enforcement Division of the IGB—regarding hiring practices at IGB.  (*Id.* 117, 119.)  Hobgood admits that he obtained a copy of the Stevens' OAR at some point, but claims he shredded the document after it was anonymously slipped under his office door, and denies giving Gnutek a copy.[4]  (Hobgood Dep. 69-70.)

On November 3, 2006, Gnutek filed a motion to amend his complaint against the IGB to include a RICO claim against Alonzo Monk and William Cellini.[5]  (Defs.' 56.1. ¶ 23; Gnutek Dep.

---

[3]    Ms. Tamayo herself has had significant litigation against the State of Illinois, alleging retaliation under Title VII and discrimination under the Equal Pay Act.  *See Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008).

[4]    Hobgood does not state when he received the OAR, nor when he shredded it. (Hobgood Dep. 69-70.)  He claims he did not directly give Gnutek a copy of the OAR, but does not dispute that he delivered the package from Tamayo, which contained the form.  (*Id.* 70.)

[5]    Alonzo Monk was former Illinois Governor Rod Blagojevich's Chief of Staff and
(continued...)

43, 46-48.) Gnutek alleged that Cellini influenced hiring practices at the IGB and Monk wrongfully attempted to replace IGB docksite supervisors with Illinois State Police officers for political reasons.[6] (Gnutek Dep. 46-48.) Again, Hobgood was involved in drafting the amendment, but he claims that his involvement was limited: he says he only discussed his "personal opinions" and that he was not acting in a "professional capacity" in helping Gnutek prepare the amended complaint. (Am. Compl. ¶ 27.) Hobgood further claims that he did not disclose to any other IDOR employees that he was assisting Gnutek, but he alleges that by late October or early November, officers at the IGB knew of Hobgood's participation in the complaint, though he does not identify any by name or explain how they learned of his participation. (Hobgood Dep. 80-81.) On November 17, 2006, Judge Castillo denied Gnutek leave to file an amended complaint.[7]

### III. Investigation and Termination of Hobgood

Plaintiffs claim that once Defendants learned that Hobgood assisted Gnutek with his lawsuit,

---

[5](...continued)
campaign manager. William Cellini raised a significant amount of money for Blagojevich through his role as Executive Director of the Illinois Asphalt Pavement Association. Both Monk and Cellini were indicted by a federal grand jury in April 2009 with Blagojevich, and charged with various felony counts including wire fraud, conspiracy, and extortion. Press Release, U.S. Dep't of Justice, *Former Gov. Rod R. Blagojevich, His Brother, Two Former Top Aides and Two Businessmen Indicted on Federal Corruption Charges Alleging Pervasive Fraud* (April 2, 2009), http://www.justice.gov/usao/iln/pr/chicago/2009/pr0402_01.pdf (last visited Mar. 28, 2011).

[6]    Though Gnutek does not directly mention the promotion of Mark Stevens in his amended complaint against Cellini and Monk, Gnutek alleged that he was injured "because he was not selected for a position at the Gaming Board because of the unlawful influence of Cellini and Monk." *Gnutek v. Illinois Gaming Board*, No. 06 C 3561 (N.D. Ill. filed June 30, 2006) (Castillo, J.) [Doc. No. 16]. Gnutek also claimed that Cellini appointed Larry Trent, then-Director of the Illinois State Police, who oversaw the riverboat gaming unit to which Gnutek was assigned. (Gnutek Dep. 47.)

[7]    Gnutek later dismissed the lawsuit on December 20, 2006 and filed a new complaint in a different district on December 29, 2006, naming only Cellini and Monk as Defendants. *See Gnutek v. Cellini et al.*, No. 07-2109 (C.D. Ill. filed Dec. 29, 2006) (Baker, J.). In May 2009, Cellini and Monk filed motions to stay the proceedings until the conclusion of their criminal case (as referenced above). Judge Baker granted the motions to stay [Doc. No. 67]; as result, Gnutek's claims against Cellini and Monk remain pending.

a "campaign of retaliation" was directed against them. (Am. Compl. ¶ 33.) Hobgood presents no evidence that any supervisors were aware of his assistance to Gnutek before Gnutek filed his amended complaint on November 16, 2006. He nevertheless contends that the first incident of retaliation occurred on November 12, 2006, when he was wrongfully accused of "insubordination" and "abusing overtime." (*Id.* ¶ 33(A).) Defendants present a different story. On November 6, 2006, Hobgood requested that his supervisor, Joseph Stratman, sign a form authorizing Hobgood to take time off from work. (Defs.' 56.1 ¶ 26.) Stratman advised Hobgood that he would be permitted to take the day off only if Hobgood assured Stratman that he would first complete a previously due report. Stratman claims that he did not receive any assurance from Hobgood that the project would be completed on time, so he did not sign the leave form. (Stratman Aff. ¶ 6.) Stratman further claims, and Plaintiffs do not dispute, that on November 8, 2006, Hobgood removed the form from Stratman's desk without his approval. (*Id.* ¶ 7.) Two days later, on November 10, Hobgood worked on a state holiday and requested overtime compensation. According to Defendants, the overtime hours were not authorized, but Stratman nevertheless granted the request on November 12, after "counsel[ing]" Hobgood on the IGB's policies regarding overtime hours.[8] (*Id.* ¶¶ 9-10.)

On November 13, 2006, Hobgood again met with Stratman. During their conversation, Stratman noticed "a small red light emitting through [Hobgood's] shirt pocket." (*Id.* ¶ 11.) According to Stratman, he asked Hobgood to reveal the contents of his pocket and Hogbood removed an iPod connected to another small device. (*Id.* ¶ 11.) Hobgood denies that any device was attached his iPod (Pls.' Resp. to Defs.' 56.1 ¶ 34), but he does not dispute that when he handed the iPod to Stratman, Stratman may have seen the words "Voice Memo" on the screen.[9] Believing that

---

[8] Stratman has not provided any further information on what he said to Hobgood, other than to note that Hobgood made an "insubordinate comment" at some point during their conversation. (Stratman Aff. ¶ 10.)

[9] Hobgood claims he does not recalling seeing the words "Voice Memo" himself. He
(continued...)

Hobgood had attempted to record their conversation, Stratman went directly to the office of his direct supervisor, Tommy Wofford, and Hobgood followed. (Stratman Aff. ¶ 13.) When Wofford confronted Hobgood about the device, Hobgood insisted that he had not recorded his conversation with Stratman. (*Id.* ¶ 14.) Following this incident, Stratman met with Wofford and Defendant Ostrowski to discuss whether any disciplinary action should result; Stratman, Wofford, and Ostrowski all eventually agreed that Hobgood should be suspended without pay.[10] (Stratman Aff. ¶¶ 17-19.)

On November 20, 2006, Stratman issued a notice of pre-disciplinary meeting to Hobgood describing the charges against him, which included removing the leave request form from Stratman's desk and Hobgood's alleged attempt to record their conversation. (Defs.' 56.1 ¶ 39.) Following that meeting on November 22, Hobgood submitted a response to these charges in which he presented a detailed rebuttal concerning the events surrounding the leave request form, though he did not deny having taken the leave form from Stratman's desk. Hobgood flatly denied any allegation that he recorded the conversation with Stratman, stating that the charge was simply "factually incorrect." (Pls.' Resp. to Defs.' 56.1 ¶ 33, 40.) Hobgood claims he did not consider the "iPod incident" a "big deal" because after the incident, the iPod was returned to him and he did not receive any news of discipline until he was later issued the notice of pre-disciplinary meeting. (Hobgood Dep. 127-29; Pls.' Resp. to Defs.' 56.1 ¶ 40.)

On December 1, 2006, Defendant Ostrowski met with Colette Walsh, the Assistant Attorney

---

[9](...continued)
further claims that Stratman began pushing buttons on the iPod once Hobgood gave it to him. (Hobgood Dep. 117.) Stratman believes that Hobgood attempted to record their conversation because after the incident, Stratman conducted some research on the Apple iPod website and learned that the words, "Voice Memo" appear on the screen when it is plugged into a microphone. (Stratman Aff. ¶ 16.)

[10] Defendants do not say when they reached this agreement, nor have they explained how long was the contemplated suspension.

General representing the IGB in Gnutek's Title VII lawsuit. (Ostrowski Dep. 20.) During their meeting, Walsh showed Ostrowski various discovery documents Gnutek had produced, including: (1) the Officer Action Request form for Mark Stevens (the Sergeant who had been promoted to Enforcement Operations Supervisor); and (2) a four-page transcript of a conversation between Hobgood and Luis Tigera from October 2005. (Ostrowski Aff. ¶ 21-22.) Walsh also met with Tigera at this time to show him the transcript, and according to Tigera, the transcript was a "verbatim" account of their conversation.[11] (Tigera Dep. 11-13.) Hobgood insists that the four-page document was not a transcript; he claims instead that he simply took "copious notes" after meeting with Tigera and then prepared the memorandum to reflect their conversation. (Hobgood Dep. 144; Pls.' Resp. to Defs.' 56.1 ¶ 46.) Tigera claims that although he recalls Hobgood taking notes during the conversation, Tigera did not believe that he was being recorded. (Tigera Dep. 15.) According to Tigera, he and Hobgood discussed a variety of topics, including why IGB's operational officer, Mike Fullman, left the department. (*Id.* 15-18.) Fullman had reported directly to Tigera at the time, and in his conversation with Hobgood, Tigera insinuated that Fullman lost his job because of his political affiliation. (*Id.* 18-19.)

On December 4, 2006, Defendant Ostrowski contacted Defendant Hartigan, then Chief Investigator of the IDOR Internal Affairs Division, the IDOR unit responsible for investigating reports of employee misconduct and possible violations of IDOR policies. (Ostrowski Aff. ¶ 23.) Ostrowski informed Hartigan that Internal Affairs might need to investigate Hobgood for his alleged recording of the conversation with Tigera. (*Id.* ¶ 23.) On December 8, 2006, Tigera contacted the Illinois State Police Division of Internal Investigations ("DII"), to file a formal complaint against Hobgood

---

[11] According to Tigera, he believed the document was a direct transcript from a previous recording because it used a "question and answer" template. The transcript identified the speakers and referred to several of Tigera's non-verbal responses (such as shrugging his shoulders). (Tigera Dep. 13.)

for "improperly or illegally" recording their conversation.[12]  (Tigera Dep. 62-64.)  Soon thereafter, Defendant Hartigan received notification from Patrick Keen, DII's Assistant Deputy Director, that the unit had accepted a criminal referral from Tigera and that IDOR's Internal Affairs Division should temporarily defer its investigation pending the completion of the DII's criminal investigation. (Hartigan Aff. ¶ 21; Ostrowski Aff. ¶ 24.)  On December 29, 2006, IDOR placed Hobgood on administrative leave.  (Defs.' 56.1 ¶ 50.)  Hobgood later received a 15-day suspension from Stratman on January 11, 2007, based on the earlier allegation that Hobgood attempted to record his conversation with Stratman.  (Stratman Aff. ¶ 23.)

DII completed its investigation on February 2, 2007, and referred the matter to the Felony Review Unit of the State's Attorney's Office; but no criminal charges were brought against Hobgood. (Ostrowski Aff. ¶ 31.)  On March 24, 2007, Hartigan received notification that DII had completed its investigation of Hobgood, and after Hartigan received a copy of DII's report, he formally began the IDOR's investigation of Hobgood in late April 2007.  (Defs.' 56.1 ¶ 61; Hartigan Aff. ¶¶ 22-23.) Hartigan first reviewed the interviews of both Hobgood and Gnutek from the DII's investigation.  In one DII interview, Gnutek again revealed that Hobgood had given him both Mark Stevens' Official Action Request form and the record of the conversation with Tigera.  (Hartigan Aff. ¶ 26.)  Soon thereafter, Hartigan met with Hobgood's supervisor, Joseph Stratman, who reported that a "significant amount" of confidential work-related information was found in Hobgood's office after he was placed on administrative leave in December 2006.  (Stratman Aff. ¶ 31.)  Specifically, Stratman had found several confidential documents, including: IDOR's original background investigation file on then-Director of the Illinois State Police, Larry Trent; copies of federal indictments for Stuart

---

[12]     The parties do not identify the specific laws that Hobgood violated by allegedly recording his conversation with Tigera, but the court recognizes that the Illinois Eavesdropping Act, 720 ILCS 5/14-1 *et seq.*, prohibits a person from knowingly and intentionally using an eavesdropping device to hear or record a conversation without the consent of all of the parties to the conversation.  720 ILCS 5/14-2(a)(1)(A).

Levine and Antoin Rezko; applications for gambling licenses; and numerous notebooks prepared by Hobgood, which detailed background information on various individuals, including Commander Tigera. (*Id.* ¶¶ 32-39.) Hartigan found these documents relevant to his Internal Affairs report, as he was tasked with investigating whether Hobgood breached any IGB rules governing confidentiality of official documents and whether Hobgood was involved in non-work related activities during office hours. (Hartigan Aff. ¶ 29.)

As part of Hartigan's investigation, he also re-interviewed Gnutek and Hobgood on May 30, 2007.[13] (*Id.* ¶ 33.) During Hartigan's interview with Hobgood, Hobgood expressed surprise that Gnutek had used the documents Hobgood gave him in the lawsuit against IGB, stating: "I was helping John Gnutek, but I never dreamed that certain documents . . . would expose me as having assisted him." (Hobgood Dep. 147.) Hobgood claims he understood that Gnutek was required to turn the documents over to the IGB during litigation, but his understanding "was not that all several thousand would be submitted." (*Id.* 149.)

On June 14, 2007, Hartigan completed his investigation and submitted his Investigative Report to Defendant Ostrowski and Defendant Krozel, IDOR Chief of Staff. (Hartigan Aff. ¶ 33.) After reviewing the report, Defendant Ostrowski determined that Hobgood's conduct merited termination. Ostrowski prepared a memorandum outlining potential violations of IDOR policies, which he provided to Deborah Tumulty, IDOR Labor Relations Director, on July 13, 2007.[14] (Ostrowski Aff. ¶ 44.) Between June and October 2007, Tumulty and Defendant Krozel drafted a Statement of Charges against Hobgood, with input from Defendants Ostrowski and Hamer. (Krozel

---

[13] Defendant Hartigan claims—and Gnutek does not dispute—that he informed Gnutek during the interview that he was not the subject of the investigation at that time, but that he could "become a subject of [an IDOR] investigation depending on what he said during the interview." (Hartigan Aff. ¶ 34.)

[14] Deborah Tumulty was initially named as a Defendant in this case, but Plaintiffs later dismissed her voluntarily. [Doc. No. 70, 79.]

Dep. ¶ 20; Defs.' 56.1 ¶ 79-80.)  On September 10, 2007, Tumulty sent Defendants Krozel and Hamer an e-mail stating the Labor Relations Department's official recommendation that Hobgood be terminated based on violations of IDOR policies, including: (1) "Conduct Unbecoming a State Employee"; (2) "Care of Official Documents"; and (3) "Confidentiality of Information."[15]  (Exs. 3-4 to Krozel Aff.; Statement of Charges, Ex. A to Proceedings Before the Illinois Civil Service Commission, Ex. R to Defs.' 56.1.)

Based on the series of prior suspensions and the IDOR investigation, Hobgood filed an EEOC charge of discrimination against IGB on September 24, 2007, alleging that the Board retaliated against him for helping Gnutek with Gnutek's own retaliation complaint.  (Hobgood Charge of Discrimination, Ex. N to Defs.' 56.1.)  One month later, on October 23, 2007, Defendant Ostrowski issued Hobgood IDOR's formal Statement of Charges, which contained the following bases for his termination:

> (1) Hobgood removed certain official IGB documents without proper authorization for non-work related reasons, including background files on Illinois State Police Director Larry Trent, and casino employees Tanya Scott and Pisce Hubbard; (2) Hobgood copied, distributed and/or divulged the contents of an internal Illinois State Police personal transaction concerning the promotion of Mark Stevens; and (3) Hobgood possessed notebooks containing the Social Security numbers of several persons which were unrelated to any of his assigned investigations.

(Proceedings Before the Illinois Civil Service Commission, Ex. R to Defs.' 56.)  On October 26, 2007, Hobgood attended a pre-disciplinary hearing regarding those charges.  (Defs.' 56.1 ¶ 82-83; Krozel Aff. ¶ 30-31.)  Hobgood submitted a rebuttal to the charges on November 16, 2007, which Defendant Krozel and Tumulty reviewed and found unconvincing.[16]  (Krozel Aff. ¶ 35; Ostrowski Aff. ¶ 49.)  On November 20, 2007, Hobgood received a 30-day suspension pending discharge, and his termination became effective on December 31, 2007.  (Krozel Aff. ¶ 36.)

---

[15]     Defendants cite to the Illinois Department of Revenue Handbook for these policies, but neither party has provided the court with copies of the relevant chapters.

[16]     Hobgood's rebuttal to these charges is not in the record.

## IV. Investigation and Termination of Gnutek

Gnutek was interviewed during DII's criminal investigation of Hobgood, but he was not the subject of any separate investigation himself until August 2007.  On August 4, 2007, Defendant Ostrowski received a report from Senior Special Agent Vincent Pattara that Gnutek had used a racial slur in reference to his African-American supervisor, Rancifer Robinson, and had attempted to access Pattara's e-mail account without his permission.  (Defs.' Mem. at 6; Ostrowski Aff. ¶ 52.)  Defendants further allege that on August 17, 2007, Gnutek conducted a series of audits of the Empress Casino that Defendants now claim were not authorized.[17]  (Defs.' Mem. at 7; Ex. 3 to Chambers Aff.)

As a result, on August 20, 2007, Defendant Ostrowski requested that John Chambers—who had replaced Defendant Hartigan as Chief Investigator for IAD—open a formal investigation in Gnutek's conduct.  (Ostrowski Aff. ¶ 54.)  On August 28, 2007, Defendant Ostrowski also requested that Luis Tigera forward Chambers a set of memoranda detailing Gnutek's activities between August 3, 2007 and August 27, 2007.  (Ex. 2 to Chambers Aff.)  Chambers assigned the investigation to one of the IAD's Investigators, Defendant Aulet.  (Defs.' 56. 1 ¶ 89.)  Aulet's investigation included reviewing Defendant Hartigan's interview of Gnutek from the Hobgood

---

[17]    During proceedings before the Illinois Civil Service Commission ("ICSC"), Defendant Ostrwoski "could not recall with any specificity the three unauthorized audits Gnutek was charged with performing," nor did he explain how he found out about Gnutek's August 17th activities. (Proceedings Before the Illinois Civil Service Commission 28, Ex. Q to Defs. 56.1.)  Defendants also do not reveal who at IGB discovered that Gnutek audited the computers at the Empress Casino. Based on the evidence presented during the proceedings, it appears to the court that two IGB employees may have reported Gnutek's activities.  Administrative Law Judge Daniel Stralka wrote in his summary of the evidence that on August 17, 2007, Gnutek approached Eileen Wilson, a computer technician for Empress Casino, and inquired about the tracing capability of the casino's telephone system.  (Proceedings Before the Illinois Civil Service Commission 55, Ex. Q to Defs. 56.1.)  Edward McHale, a senior surveillance agent for Empress, also testified at the ICSC proceedings that during his shift at around 11:30 p.m. on August 17, Gnutek had asked to see "the [surveillance] tape retention log[,] so he could do an audit."  McHale gave Gnutek the log book, but Gnutek did not examine any surveillance tapes in McHale's presence.  (Proceedings Before the Illinois Civil Service Commission 57, Ex. Q to Defs. 56.1.)

investigation, obtaining witness statements concerning Gnutek's actions at the casino, and interviewing Agent Pattara and Sergeant Robinson. Defendant Aulet and Chambers also interviewed Gnutek on October 4, 2007. (Aulet Aff. ¶ 20.) During the interview, Gnutek insisted he was unaware that he had accessed Agent Pattara's e-mail account, though he admitted to conducting audits of the casino without authorization.[18] (Aulet Aff. ¶ 20.) On October 16, 2007, Chambers advised Defendants Ostrowski and Krozel that, given Gnutek's admissions during Hobgood's earlier investigation, IDOR could charge and discipline Gnutek for "misuse of confidential information." (Chambers Aff. ¶¶ 23-24; Krozel Aff. ¶ 44.) On November 5, 2007, Aulet submitted the formal findings from his investigation of Gnutek to Chambers, who then forwarded the report to Defendant Krozel. (Aulet Aff. ¶ 21.) In the report, Aulet concluded that "[t]he facts and evidence [from his] investigation, in total"—including Gnutek entering Pattaras' e-mail account and forwarding Pattaras' e-mails to Gnutek's own account—"indicate serious and egregious violations" of IDOR policies. (Investigative Report, Ex. 4 to Aulet Aff.)

In December 2007, Defendant Krozel sent Gnutek's union representative a Statement of Charges against Gnutek with supporting documents, including Aulet's report. (Krozel Aff. ¶ 45.) That Statement charged Gnutek with violating the following IDOR regulations: (1) "Conduct Unbecoming a State Employee"; (2) "Care of Official Documents"; and (3) "Reporting Employee Misconduct." (Statement of Charges, Ex. A to Proceedings Before the Illinois Civil Service Commission, Ex. Q to Defs.' 56.1.) The Charges contained the following factual bases for his termination:

> (1) Gnutek received, removed and released certain official and confidential documents without proper authorization for non-work related reasons, including an Official Action Request form for Mark Stevens; (2) Gnutek failed to report that other IGB employees were in possession of these same documents; (3) Gnutek attempted to retrieve a co-worker's emails without proper authorization; and (4) Gnutek

---

[18] Aulet does not state whether he questioned Gnutek at that time about the racial slur allegation.

conducted three unauthorized audits [of the Empress Casino] and failed to submit required reports to his supervisor.

(Proceedings Before the Illinois Civil Service Commission, Ex. Q to Defs.' 56.1)  On February 8, 2008, IDOR initiated a pre-disciplinary hearing for Gnutek.  (Krozel Aff. ¶ 46.)  On February 13, 2008, Gnutek's attorney sent Defendant Hamer a rebuttal to his charges, denying that Gnutek had improperly received confidential IDOR documents and warning that Gnutek planned to sue the IGB for retaliation if he was disciplined in any way, as he was being "punished for speaking out" about the "misdeeds" at the IGB.  (Gnutek's Rebuttal, Ex. 8 to Hamer Aff.)  After reviewing Gnutek's rebuttal, Defendant Krozel determined that IDOR should move forward with Gnutek's termination. (Krozel Aff. ¶ 46.)  Defendant Hamer subsequently received a briefing from Krozel regarding Gnutek's termination and it became effective on March 28, 2008.  (Defs.' 56.1 ¶ 111; Krozel Aff. ¶ 47.)

## V.    Current Lawsuit and Findings of the Illinois Civil Service Commission

Plaintiffs filed the instant complaint on September 19, 2008, alleging that Defendants retaliated against them in violation of Title VII and the First Amendment.  Both Gnutek and Hobgood also appealed their terminations to the Illinois Civil Service Commission.  (Defs.' 56.1 ¶¶ 118-19.) Initial administrative hearings were conducted before Administrative Law Judge Daniel Stralka, who recommended that Hobgood receive a 60-day suspension and Gnutek be terminated.  (Defs. 56.1 ¶ 120; Proceedings Before the Illinois Civil Service Commission, Ex. Q to Defs.' 56.1; Proceedings Before the Illinois Civil Service Commission, Ex. R to Defs.' 56.1.)  The Illinois Civil Service Commission affirmed the recommended 60-day suspension for Hobgood but concluded that Gnutek should be suspended for 90 days rather than terminated, given his previous work performance record.  (Finding and Decision of the Commission, Ex. S to Defs.' 56.1; Finding and Decision of the Commission, Ex. T to Defs.' 56.1.)  On January 20, 2009, Gnutek filed an EEOC charge of discrimination, alleging that the IDOR and IGB retaliated against him for filing his 2006 complaint.

(Gnutek Charge of Discrimination, Ex. M to Defs.' 56.1.)  Gnutek received his right-to-sue letter for the EEOC charges on February 26, 2009, and Plaintiffs filed an amended complaint on March 26, 2009.  Gnutek also appealed the Civil Service Commission's affirmation of his 90-day suspension to the Circuit Court of Will County, and the court affirmed the Commission's decision on January 19, 2010.  (*Gnutek v. IDOR et al.*, 09 MR 435, Ex. U to Defs.' 56.1)

### ANALYSIS

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a), (c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Therefore, in order to withstand a motion for summary judgment, the nonmoving party must show a dispute about a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Plaintiffs allege that Defendants harassed them in relation for the complaint Gnutek filed in 2006 and the assistance Hobgood provided to Gnutek.  Defendants contend that Plaintiffs have failed to present any genuine dispute of material fact in this case, arguing specifically: (1) Gnutek's claims are barred by claim preclusion; (2) Hobgood has shown no evidence of Title VII retaliation under the direct method of proof; and (3) Hobgood has failed to show a causal link between his assistance to Gnutek and his termination.[19]  The court will address each argument in turn.

---

[19]    Defendants additionally argue that even if Plaintiffs have established a prima facie case of retaliation under Title VII and the First Amendment, the individual Defendants are entitled to qualified immunity.  For the reasons stated below, the court need not address Defendants' qualified immunity claim.

**I.  Claim Preclusion on Counts III & IV: Gnutek's Title VII and § 1983 Retaliation Claims**

The doctrine of *res judicata*, or claim preclusion, bars parties from re-litigating claims raised in a prior action when there is (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or their privies in the two suits.  *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir. 1982); *Nowak v. St. Rita High Sch.*, 197 Ill.2d 381, 390, 757 N.E.2d 471, 477 (2001).  Defendants argue Gnutek is barred from pursuing his retaliation claims under either Title VII or § 1983 because there was a final state court judgment based on the same factual allegations in the instant complaint, and the instant case involves the same parties and their privies.  (Defs.' Mem. at 9-10.)  Plaintiffs concede that the earlier state proceedings and the instant suit arose from the same set of operative facts, but Gnutek urges that *res judicata* does not bar this lawsuit because (1) there has been no final state court judgment, and (2) there is no privity between the Defendants in the earlier administrative proceeding and the instant suit.

The court agrees with Defendants that Gnutek's claims are barred.  Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a state court judgment "must be given the same *res judicata* effect in federal court that it would be given in the court of the rendering state."  *LaSalle Nat. Bank of Chicago v. County of DuPage*, 856 F.2d 925, 930 (7th Cir. 1998) (citing *Torres v. Rebarchak*, 814 F.2d 1219, 1222 (7th Cir. 1987)).  The Supreme Court has held specifically that claims under both Title VII and § 1983 are precluded when a state court judgment has been rendered in a state whose laws would give the judgment preclusive effect.  *Welch v. Johnson*, 907 F.2d 714, 719 (7th Cir. 1990) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 476 (1982); *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 84 (1984).  In this case, Gnutek appealed his termination to the Illinois Civil Service Commission, which ordered a 90-day suspension instead of termination. He appealed the Commission's decision to the Will County Circuit Court, which affirmed the 90-day suspension order.  Plaintiffs argue that the state court judgment is not final because Gnutek has

since appealed the Circuit Court's decision. As Defendants point out, however, both the Seventh Circuit and Illinois courts adhere to the general rule that a state court's final judgment may be given preclusive effect even though the judgment is being appealed. See *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864, 868 (N.D. Ill. 2007); *Berry v. Illinois Dep't. of Human Services*, No. 00 C 5538, 2001 WL 111035, at *14 (N.D. Ill. Feb. 2, 2001).

Nor is the court moved by Gnutek's argument that, because Defendants Ostrowski, Hamer, Krozel, Hartigan and Aulet are sued in both their individual and official capacities, they are not in privity with the government agencies involved in the earlier state proceedings. Under Illinois law, "a government and its officers are in privity for purposes of *res judicata*," and naming additional government actors as defendants in their individual capacities does not defeat claim preclusion. *Licari v. City of Chicago*, 298 F.3d 664, 667 (7th Cir. 2002). In *Licari*, a police officer who was seeking disability benefits brought a due process case against the Retirement Board of the Policemen's Annuity and its individual members after it found that he was not disabled under the Illinois Pension Code. *Id.* at 665-66. Upon reviewing the district court's dismissal of Licari's complaint, the Seventh Circuit found privity between the Board and its officers "especially warranted," even though they were sued in their individual capacities, because the plaintiff did not allege any action taken by the individual defendants that was "separate and distinct" from any action taken by the Board. *Id.* at 667. Here, similarly, Gnutek has alleged no claims against the individual Defendants that are "separate and district" from any action taken by IDOR and IGB.

"An exception to the res judicata rule exists if the plaintiff did not have a full and fair opportunity to litigate his claim in state court." *Id.* at 666-67. In Illinois, however, the doctrine of "merger and bar" precludes the "pursuit not only of claims actually litigated, but of those that could have been litigated." *Garcia v. Village of Mount Prospect*, 360 F.3d 630, 639 (7th Cir. 2004) (holding that under Illinois law, a plaintiff can join a full-blown §1983 claim to even a limited on-the-

17

record judicial review of an agency decision); *see also Girot v. Municipal Officers Electoral Bd.*, No. 05 C 419, 2006 WL 59393, at *7 (N.D. Ill. Jan. 5, 2006) (collecting cases). Thus, so long as Gnutek could have joined his instant federal claims with the administrative appeal of the Commission's decision, he had a "full and fair opportunity to litigate those claims under Illinois law." *Id.* Gnutek has not argued that his civil rights claims could not have been raised in the previous state court proceedings, and the court declines to entertain such claims *sua sponte.* All elements for *res judicata* are satisfied, and Gnutek's Title VII and First Amendment retaliation claims are both now barred.

## II.       Count I: Hobgood's Title VII Retaliation Claim

The anti-retaliation provision of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to survive summary judgment, "[a] plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (citing *Moser v. Ind. Dep't. of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)). Under the direct method of proof, a plaintiff must show the following: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action by the employer; and (3) there was a causal connection between the two. *Id.* at 663 (citation omitted); *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009).

There is no dispute that filing an EEOC charge of discrimination or a federal lawsuit constitutes protected activity under Title VII. *See O'Neal*, 588 F.3d at 409; *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003). In this case, Gnutek alone filed the 2006 lawsuit against the IGB, but Hobgood claims the IGB retaliated against him for providing assistance to Gnutek, and presents evidence that he helped Gnutek "further[] his claims" against the IGB by

18

organizing the complaint and exhibits for trial. (Hobgood Dep. 33; Am. Compl. ¶ 20.) This evidence is sufficient to establish "assist[ance]" or "participat[ion]" for purposes of a retaliation claim under Title VII. *See* 42 U.S.C. § 2000e-3(a). And it is undisputed that Hobgood suffered an adverse employment action. He identifies three such actions: (1) an "abusive" investigation; (2) suspension; and (3) termination. (Pls.' Mem. at 21.) While the motivation behind IDOR's investigation of Hobgood is contested, his ultimate termination certainly constituted a "materially adverse action" under the second prong of the direct method. *Tomanovich*, 406 F.3d at 664.

The remaining issue is whether Hobgood has shown a causal link between his participation in Gnutek's lawsuit and his eventual discharge. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (citations omitted). Defendants argue that Hobgood has offered no evidence of retaliation under the direct method and nothing to show that the "real reason" for his investigation and subsequent termination was that he assisted Gnutek with his Title VII claims. (Defs.' Mem. at 16.) Defendants urge that the "decision to terminate Hobgood was based on his repeated misuse of workplace information, not because he may have provided assistance to Gnutek." (*Id.* at 18.) Hobgood insists that a question of fact remains as to whether he was investigated and terminated for misuse of confidential work information, and that there is sufficient evidence from which one could conclude that he was only disciplined for helping Gnutek. (Pls.' Mem. at 23.)

Under the direct method of proof, a plaintiff may rely on either direct or circumstantial evidence. *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005). In either case, a plaintiff may avoid summary judgment by "'creat[ing] a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation.'" *Id* (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997)). Hobgood puts forth several pieces of circumstantial evidence which he believes present a genuine issue of material fact about the IGB's motivation for his termination: (1) Defendant Ostrowski requested Hobgood's termination before his investigation; (2) Defendant Hartigan failed to comply with internal IDOR policy for

investigations; and (3) Defendant Hartigan references Gnutek's lawsuit in his report.[20]  (Pls.' Mem. at 23-27.)  Hobgood contends that "an employer who was interested in a fair and impartial decision would not . . . advocat[e] for a specific type of discipline before an investigation has even commenced."  (*Id.* at 23.)  Yet as Defendants point out, there is no evidence that Defendant Ostrowski directly conveyed to anyone at IGB that Hobgood should be terminated without an investigation.[21]

As for Defendant Hartigan, Hobgood alleges that (1) Hartigan did not create a "case initiation form" for his investigation of Hobgood as he was required to do under internal IDOR policy; and (2) Hartigan's investigative report includes references to Gnutek's lawsuits, which should have been irrelevant to his primary focus: whether Hobgood tape recorded a conversation with Luis Tigera.  (Id. at 25.)  Hobgood is correct that an employer's departure from its own policies may constitute circumstantial evidence of discrimination.  *See Rudin v. Lincoln Land Community College*, 420 F.3d 712 at 723 ("systematic abandonment" of stated hiring policies and practices supported inference that failure to hire plaintiff was a product of race and sex discrimination.)  In this case, however, Hobgood has demonstrated no "systematic abandonment" of IDOR's policies

---

[20]     The court notes that Hobgood's evidence assumes that IDOR officials were aware of his assistance to Gnutek in filing the previous Title VII complaint, an assumption not obviously supported in this record.

[21]     Hobgood claims that Defendant Ostrowski told Defendant Hartigan that Hobgood should be terminated before he was investigated.  The facts do not entirely support this assertion. Hobgood points to a memorandum Defendant Ostrowski composed in April 2007, outlining the timeline of events in Hobgood's investigation.  Ostrowski recounted in that memo the plan, as of March 2, 2007, for Hartigan to "open a case on the Tigera matter but not on the Stratman matter as discipline was already imposed . . . . Michael Fries [IGB's Chief Legal Counsel] advised Hartigan that the IGB wants discharge to be considered as the first option."  (Pls.' 56.1 ¶ 157.)  Given that Defendant Ostrowski is the IGB Administrator, Hobgood has assumed that Fries' advice to Hartigan conveyed Defendant Ostrowski's opinion as well.  Yet there is no evidence that Ostrowski actually recommended Hobgood's termination without an investigation.  In any event, by March 2007, Ostrowski had reason to believe that Hobgood attempted to record his conversation with Stratman, may have also recorded a conversation with Tigera, and gave confidential documents to Gnutek. Thus, he may have had reasonable non-discriminatory bases for believing Hobgood's conduct merited termination at that time.  (Defs.' Mem. at 8.)

regarding internal investigations.  As Defendants note, Hobgood does not claim that Defendant Hartigan "routinely filled out case forms for all of his other investigations, or that he engaged in other practices that would suggest he treated the Hobgood investigation differently."  (Defs.' Mem. at 9.)

Hobgood's strongest piece of evidence is the fact that certain reports from Defendants Hartigan and Ostrowski made repeated reference to Gnutek's lawsuit. (Pls.' Mem. at 25.) But even this piece of evidence fails to establish a causal connection between Hobgood's assistance to Gnutek in 2006 and his termination in December 2007.  What drew the attention of IDOR officials to investigate Hobgood in the first place was the alleged recording of a conversation with Stratman; only later, after Gnutek filed his complaint, did IDOR officials learn from documents produced in discovery that Hobgood may have recorded a conversation with Luis Tigera and provided Gnutek with confidential IDOR documents.  In any event, Hobgood admits IGB employees did not confront or harass him about the extent of his *assistance* to Gnutek; he was questioned only about the *nature* of IDOR documents he gave Gnutek.  Thus, viewing the evidence as a whole, the court concludes Hobgood has not met his burden under the direct method of proof.[22]  Summary judgment is therefore granted to Defendants on Hobgood's Title VII claim.

## III.    Count II: Hobgood's First Amendment Relation Claim

On summary judgment, a public employee alleging a § 1983 claim of First Amendment retaliation must demonstrate that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation as a result of her employer's action; and (3) the protected speech was the

---

[22]    Hobgood relies exclusively on the direct method to prove his case, but the court believes the circumstantial evidence he presents is insufficient under the indirect or "burden-shifting" method proof as well.  Defendants have presented significant evidence of "legitimate, non-discriminatory" reasons for Hobgood's termination, and Hobgood has not persuaded the court that Defendants' reasons for his discharge were pretextual. *See Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010).  In particular, Hobgood offers nothing to suggest that any other IDOR employee who misused confidential data was treated more favorably than he.

but for cause of the employer's action. *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 500-01 (7th Cir. 2010). As explained earlier, the parties do not dispute that Hobgood suffered a deprivation in this case. Defendants instead argue that Hobgood did not engage in any constitutionally protected activity and that Hobgood has not established that but for his assistance to Gnutek, he would not have been terminated.

### A.    Constitutionally Protected Activity

In determining whether Hobgood's speech was constitutionally protected in this case, the court must apply the two-step inquiry known as the *Connick-Pickering* test. *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Under *Connick*, the question is "whether the speech addressed a matter of public concern"; if it did, then under the *Pickering* balancing test, the question becomes "whether the government's interest as an employer in providing effective and efficient services outweighs the employee's interest as a citizen in commenting upon the matter of public concern." *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004) (citations omitted); *see also Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (quoting *Siqsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007).

"Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as revealed by the whole record.'" *Gustafson v. Jones*, 290 F.3d 895, 906-07 (7th Cir. 2002) (collecting cases). As a threshold issue, Defendants argue there is no evidence that Hobgood actually engaged in any "speech" by delivering documents to Gnutek for use in his amended complaint. Hobgood claims that his advice to Gnutek was protected speech because Plaintiffs sought to "outline a pattern of corruption" within IGB in Gnutek's complaint, specifically naming "prominent public officials and prominent businessmen." (Am. Compl. ¶¶ 28-29.) The court recognizes that Hobgood may have acted as more than a simple courier service (Pls.' Mem. at 27), given the substantial evidence in the record that Hobgood repeatedly met with Gnutek in person to help draft Gnutek's complaints against IGB.

Significantly, however, there is no evidence in the record that Defendants were actually aware of Plaintiffs' meetings. Though the Seventh Circuit has held that an employee's "speech" may include his or her private writings, such writings must be somehow "communicated" to one's employer. *See Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004). In this case, it appears as though only Jeannette Tamayo—then interim administrator at the IGB—knew of Gnutek's plans to sue the IGB in 2006. Absent any Defendant knowing about Gnutek's plans or Hobgood's participation, the court must conclude that Hobgood's assistance in drafting Gnutek's complaint did not constitute speech.

### B. Causation

Defendants contend, further, that even if Hobgood engaged in constitutionally protected speech, he has failed to make the necessary causal link between his assistance to Gnutek and his termination. Defendants maintain that there were "legitimate reasons for suspending Hobgood for his conduct toward Stratman, for the Internal Affairs investigation, and ultimately for deciding to terminate him." (Defs.' Mem. at 21.) A plaintiff alleging a retaliation under the First Amendment must establish that his protected activity was the "but for" cause of the adverse employment action. *Kodish*, 604 F.3d at 501 (citing *Gunville v. Walker*, 583 F.3d 979, 983 (7th Cir. 2009); *Gross v. FBL Fin. Serv., Inc.*, 129 S. Ct. 2343, 2351 (2009)) ("[U]nless a federal statute provides otherwise, the plaintiff bears the burden of demonstrating but for causation in suits brought under federal law."); *see also Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009). Plaintiffs claim that a reasonable jury could conclude that Hobgood was fired because of the assistance he provided to Gnutek. Defendants contend that Hobgood was in effect, partially terminated for "helping" Gnutek, but for different reasons than Hobgood suggests; namely for his misappropriation of confidential IDOR documents, not because he helped Gnutek organize his complaint. (Defs.' Mem. at 12.)

The court recognizes that there may be circumstances in which gathering information about misfeasance by public workers could be part of a protected effort to expose corruption. Thus, in *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 668 (7th Cir. 2009), a case cited by

23

neither party, defendants discovered that plaintiff, suspicious about "ghost-payrolling," had photocopied her co-workers' sign-in sheets. *Id.* Plaintiff alleged that her resulting termination, despite the fact that no work rule was violated, supported a retaliation claim, and the Seventh Circuit agreed. Plaintiff had offered sufficient evidence to "cast serious doubt on the legitimacy of [d]efendants' stated reason for terminating her, . . . " where one of the defendants said, "[plaintiff] is going to get her butt canned" for voicing her suspicions to a former employee. *Id.* at 669.

Hobgood here has not cast serious doubt on Defendant's reason for his discharge. Defendants have provided a lengthy history detailing the events leading up to Hobgood's investigation and eventually termination, much of which is not in material dispute. Hobgood's first notice of a pre-disciplinary hearing in November 2006, resulted from two events entirely unrelated to Gnutek's lawsuit: (1) he removed a leave slip from the desk of his supervisor, Joseph Stratman; and (2) he was accused of attempting to record a conversation with Stratman. It is undisputed that certain documents found during discovery in Gnutek's suit in December 2006 triggered the IDOR's formal investigation of Hobgood, but the criminal investigation resulted from the specific allegation that he had illegally recorded a conversation with Deputy Administrator Tigera—not because he gave a transcript of their conversation to Gnutek. In January 2007, Gnutek told investigators that Hobgood gave him a packet of documents, including a copy of an OAR form regarding Mark Stevens, which contained Stevens' Social Security number. Defendants note that the OAR form is a confidential IDOR document and an employee who receives a copy of the document is obligated under IDOR rules to report it to a higher authority. (Proceedings Before the Illinois Civil Service Commission, Ex. Q to Defs.' 56.1.) Plaintiffs have provided no evidence to suggest otherwise, and have presented no legitimate reason for their use of confidential information. Later in March 2007, Stratman found several documents and notepads in Hobgood's office suggesting that he was performing non-work activities while at the office. Finally, Defendant Ostrowski recommended Hobgood's termination only after his review of Defendant Hartigan's Internal Affairs

investigation.

Hobgood has provided no evidence that it was retaliation, rather than these circumstances that motivated his termination. Nor has he presented any evidence that an employee guilty of these infractions who had not assisted in a co-worker's lawsuit would not have been terminated. The court grants summary judgment for Defendants on Hobgood's First Amendment claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment [116] is granted.

ENTER:

Dated: March 30, 2011

_____

REBECCA R. PALLMEYER
United States District Judge